

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-29-1999

# In Re: SGL Carbon Corp, [ Official Comm. of Unsec. Cred. vs. Nucor Corp]

Precedential or Non-Precedential:

Docket 99-5319

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"In Re: SGL Carbon Corp, [ Official Comm. of Unsec. Cred. vs. Nucor Corp]" (1999). *1999 Decisions.* Paper 332.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/332

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 29, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 99-5319 & 99-5382

IN RE: SGL CARBON CORPORATION, Debtor

OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
     Appellant at No. 99-5319

v.

NUCOR CORPORATION;
NUCOR-YAMATO STEEL COMPANY,
     Appellants at No. 99-5382

On Appeal from the United States District Court
for the District of Delaware
D.C. Civil Action No. 98-cv-02779
(Honorable Joseph J. Farnan, Jr.)

Argued July 29, 1999

Before: SCIRICA and McKEE, Circuit Judges,
and BROTMAN, District Judge*

(Filed: December 29, 1999)

_____

* The Honorable Stanley S. Brotman, United States District Judge for the
District of New Jersey, sitting by designation.

PHILIP BENTLEY, ESQUIRE
 (ARGUED)
KENNETH H. ECKSTEIN, ESQUIRE
Kramer, Levin, Naftalis & Frankel
919 Third Avenue
New York, New York 10022

TERESA K.D. CURRIER, ESQUIRE
Duane, Morris & Heckscher
1201 Market Street, Suite 1500
P.O. Box 195
Wilmington, Delaware 19899

 Attorneys for Appellant/Cross-
 Appellee, Official Committee of
 Unsecured Creditors

JAMES J. RODGERS, ESQUIRE
 (ARGUED)
Dilworth, Paxson, Kalish
 & Kauffman
1735 Market Street
3200 The Mellon Bank Center
Philadelphia, Pennsylvania 19103

MICHAEL D. RIDBERG, ESQUIRE
Ridberg, Press & Sherbill
Three Bethesda Metro Center,
 Suite 650
Bethesda, Maryland 20814

 Attorneys for Appellants,
 Nucor Corporation; Nucor-Yamato
 Steel Company

2

GEORGE J. WADE, ESQUIRE
  (ARGUED)
Shearman & Sterling
599 Lexington Avenue
New York, New York 10022

LAURA D. JONES, ESQUIRE
Young, Conaway, Stargatt & Taylor
P.O. Box 391
Rodney Square North, 11th Floor
Wilmington, Delaware 19899-0391

 Attorneys for Appellee,
SGL Carbon Corporation

OPINION OF THE COURT

SCIRICA, Circuit Judge.

The issue on appeal is whether, on the facts of this case, a Chapter 11 bankruptcy petition filed by a financially healthy company in the face of potentially significant civil antitrust liability complies with the requirements of the Bankruptcy Code. In this case, the Official Committee of Unsecured Creditors of SGL Carbon Corporation appeals the District Court's order denying its motion to dismiss SGL Carbon's Chapter 11 bankruptcy petition on bad faith grounds.

This case also presents the threshold issue whether we will adopt a "good faith" requirement for Chapter 11 petitions. We will. After undertaking the fact intensive analysis inherent in the good faith determination, we conclude that SGL Carbon's Chapter 11 petition lacks a valid reorganizational purpose and, therefore, lacks the requisite good faith. We will reverse.

I.

SGL Carbon is a Delaware corporation that manufactures and sells graphite electrodes used in steel production.1 In

_____

1. SGL Carbon Corp. is a wholly-owned subsidiary of SGL Aktiengesellschaft (SGL AG), a German corporation. SGL Carbon Corp. is

1997, the United States Department of Justice commenced an investigation of alleged price-fixing by graphite electrode manufacturers, including the SGL Carbon Group.2 Soon thereafter, various steel producers filed class action antitrust lawsuits in the United States District Court for the Eastern District of Pennsylvania against SGL Carbon and other graphite electrode manufacturers. The District Court consolidated the cases into a single class action and certified a class under Fed. R. Civ. P. 23(b)(3) consisting of all United States purchasers of graphite electrodes between 1992 and 1997. Many class members opted out of the class before the November 28, 1998 opt-out deadline and subsequently filed or threatened to file separate antitrust lawsuits. Since the class certification, six complaints have been filed in federal district court and one complaint has been filed in a Canadian court.

In June 1998, SGL Carbon's German parent SGL AG recorded a charge in Deutschmarks of approximately $240 million as its "best estimate" of the SGL Carbon Group's3 potential liability in the criminal and civil antitrust litigation.4

_____

comprised of two "business units"--the North American Carbon/ Graphite unit, which is of primary interest here, and the specialty carbon unit.

2. In May 1999, SGL AG (SGL Carbon's parent) and its chairman Robert Koehler each pled guilty to several criminal antitrust charges and agreed to pay fines of $135 million and $10 million respectively. It is important to note that the guilty pleas and the payment of the criminal fines by the parent company occurred after the filing of the Chapter 11 petition and the District Court's denial of the motion to dismiss.

3. According to the stipulated facts, "[t]he SGL CARBON Group has more than 28 manufacturing facilities in 10 countries and has sales in more than 90 countries. The SGL CARBON Group is the largest manufacturer of carbon and graphite products in the world and the second largest manufacturer of graphite electrodes. The North American Carbon/Graphite Business Unit is one of two business units of the Debtor. The North American Carbon/Graphite Business Unit operates only in the United States and Canada." Stipulation of Facts, No. 98B-2779, at *1. It is important to note, therefore, that SGL Carbon Corp. is only one part of the SGL Carbon Group.

4. Although the record does not reflect the amount by which the $240 million reserve was increased by SGL AG subsequent to its guilty plea and accompanying fine, the parties have indicated that the reserve was increased. It is significant that, at the time of SGL Carbon's Chapter 11 petition, the $240 million reserve was in place and untouched.

On December 16, 1998, at the direction of SGL AG, SGL Carbon filed a voluntary Chapter 11 bankruptcy petition in the United States District Court for Delaware. In SGL Carbon's Disclosure Statement, in a section addressing "Factors Leading to [the] Chapter 11 Filing," SGL Carbon only discussed the antitrust litigation. The bankruptcy filing contained a proposed reorganization plan under which only one type of creditor would be required to accept less than full cash payment for its account, namely the antitrust plaintiffs who obtained judgments against SGL Carbon. Under the plan, potential antitrust judgment creditors would receive credits against future purchases of SGL Carbon's product valid for 30 months following the plan's confirmation. The proposed plan also bars any claimant from bringing an action against SGL Carbon's affiliates, including its parent SGL AG, "based on, relating to, arising out of, or in any way connected with" their claims against SGL Carbon.

The next day, on December 17, in a press release, SGL Carbon explained it had filed for bankruptcy "to protect itself against excessive demands made by plaintiffs in civil antitrust litigation and in order to achieve an expeditious resolution of the claims against it." The press release also stated:

> SGL CARBON Corporation believes that in its case Chapter 11 protection provides the most effective and efficient means for resolving the civil antitrust claims.
> . . .
>
> . . . .
>
> "SGL CARBON Corporation is financially healthy," said Wayne T. Burgess, SGL CARBON Corporation's president. "If we did not face [antitrust] claims for such excessive amounts, we would not have had to file for Chapter 11. We expect to continue our normal business operations."
>
> . . . .
>
> However, because certain plaintiffs continue to make excessive and unreasonable demands, SGL CARBON Corporation believes the prospects of ever reaching a

5

commercially practicable settlement with them are remote. After much consideration, SGL CARBON Corporation determined that the most appropriate course of action to address the situation without harming its business was to voluntarily file for chapter 11 protection.

. . . .

Contemporaneous with the press release, SGL AG Chairman Robert Koehler conducted a telephone conference call with securities analysts, stating that SGL Carbon was "financially healthier" than before and denying the antitrust litigation was "starting to have a material impact on [SGL Carbon's] ongoing operations in the sense that . . . [it was] starting to lose market share." He also stated that SGL Carbon's Chapter 11 petition was "fairly innovative [and] creative" because "usually Chapter 11 is used as protection against serious insolvency or credit problems, which is not the case [with SGL Carbon's petition]."

Two weeks after SGL Carbon filed its petition and issued the press release, the United States Trustee formed a nine member Official Committee of Unsecured Creditors. Eight of the committee members are antitrust plaintiffs; two of the eight serve as class representatives and the other six have opted out of the class.5 In January 1999, the Committee filed a motion to dismiss SGL Carbon's bankruptcy petition on the grounds that it was a "litigation tactic designed to frustrate the prosecution of the civil antitrust claims pending against [SGL Carbon] and preserve[SGL Carbon's] equity from these claims." In re SGL Carbon Corp., 233 B.R. 285, 287 (D. Del. 1999).

The District Court held a hearing on the motion on February 17, 1999.6 Neither side presented witnesses. The evidence was entirely documentary or deposition testimony, including the deposition of SGL Carbon's Vice President Theodore Breyer, who directs the company's graphite electrode business in the United States. In his deposition, Breyer testified that SGL Carbon was financially healthy,

---

5. The ninth Committee member is a trade creditor--Conoco, Inc.

6. SGL Carbon's case was not referred to a bankruptcy court.

having no overdue debts when it filed its Chapter 11 petition. Breyer stated that he recommended filing for bankruptcy because he believed SGL Carbon "could not expeditiously settle with the [antitrust] plaintiffs" absent Chapter 11 protection. Acknowledging that bankruptcy protection was the "sole reason" SGL AG's Executive Committee had authorized the Chapter 11 petition, Breyer testified that he believed filing for Chapter 11 would "change the negotiating platform" with plaintiffs and "increase the pressure on . . . plaintiffs to settle."

The District Court denied the Committee's motion to dismiss on April 23, 1999 assuming, without deciding, that 11 U.S.C. S 1112(b) imposes a duty of good faith upon bankruptcy petitioners. It further assumed this duty requires the proposed reorganization to further what it characterized as Chapter 11's purpose: " `to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors and produce a return for its stockholders.' " SGL Carbon Corp., 233 B.R. at 288 (quoting H.R. Rep. No. 595 (1977) reprinted in 1978 U.S.C.C.A.N. 6179). The court made nofindings that SGL Carbon filed for bankruptcy for reasons other than to improve its negotiating position with plaintiffs. But the court concluded the petition furthered the purpose of Chapter 11 because plaintiffs' litigation was imperiling SGL Carbon's operation by distracting its management, was potentially ruinous and could eventually force the company out of business. The court explained that

> [t]he distractions of the litigation pose a serious threat to the continued successful operations of [SGL Carbon]. Further, the potential liability faced by [SGL Carbon] could very well force it out of business. Consistent with the policies and purposes of Chapter 11 which encourage early filing so as to increase the possibility of successful reorganization, the Court will not allow [SGL Carbon] to wait idly by for impending financial and operational ruin, when [SGL Carbon] can take action now to avoid such a consequence.

SGL Carbon Corp., 233 B.R. at 291.

The Committee has appealed.

II.

The District Court had jurisdiction over this bankruptcy case under 28 U.S.C. S 1334(a). We have jurisdiction under 28 U.S.C. S 1291. See In re Brown, 916 F.2d 120, 124 (3d Cir. 1990) (holding that order denying motion to dismiss a bankruptcy petition is "final" under 28 U.S.C.S 1291).

We have not yet had occasion to decide what standard of review to apply to a dismissal of a Chapter 11 petition. Consistent with the other courts of appeals to consider the issue, we believe this decision is committed to the sound discretion of the bankruptcy or district court and will review for abuse of discretion. See, e.g., Leavitt v. Soto (In re Leavitt), 171 F.3d 1219 (9th Cir. 1999) (reviewing for abuse of discretion);7 In re Abijoe Realty Corp., 943 F.2d 121, 128 (1st Cir. 1991) (same). Mindful that "an abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact," ACLU v. Black Horse Pike Reg'l Bd. of Ed., 84 F.3d 1471, 1476 (3d Cir. 1996) (internal quotations omitted), we review the findings of fact leading to the decision for clear error and exercise plenary review over the court's conclusions of law. See First Jersey Nat'l Bank v. Brown (In re Brown), 951 F.2d 564, 567 (3d Cir. 1991). See also Leavitt, 171 F.3d at 1222 (applying differing standards of review to different components of good faith/bad faith determination); Abijoe Realty Corp., 943 F.2d at 128 (same).

III.

11 U.S.C. S 1112(b) governs the dismissal or conversion of Chapter 11 petitions. It provides in part:

> [T]he court may convert a case under [Chapter 11] to a case under Chapter 7 . . . or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause . . . .

_____

7. Although In re Leavitt addressed a good faith determination regarding a Chapter 13 bankruptcy petition, there is no significant distinction between Chapter 11 and Chapter 13 petitions with respect to the appropriate standard of review.

8

11 U.S.C. S 1112(b).

The statute provides for dismissal for cause, if it is in the best interest of the creditors and the estate. Conversion is not an option here.8 We will determine whether there is cause for dismissal.

A.

The threshold issue is whether Chapter 11 petitions may be dismissed for "cause" under 11 U.S.C. S 1112(b) if not filed in good faith. Although we have not squarely addressed this issue, we implied in First Jersey Nat'l Bank v. Brown (In re Brown), 951 F.2d 564 (3d Cir. 1991), that Chapter 11 imposes a good-faith obligation. In Brown, we considered evidence of bad faith in reviewing the dismissal of a Chapter 11 petition, but concluded "the evidence . . . of bad faith . . . was not strong enough for us to say that it was established as a matter of law." Id. at 572. Because Brown focused on the adequacy of the record for making a good faith/bad faith determination, we did not expressly address whether "bad faith" constituted cause for dismissal. In this case, we make clear what we implied in

_____

8. In other circumstances, deciding a motion to dismiss under 11 U.S.C. S 1112(b), may involve a two-step process offirst deciding whether there is cause and then deciding whether to dismiss or convert. See Rollex v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.), 14 F.3d 240, 242 (4th Cir. 1994). That procedure is understandable when applied to the statutory bases for finding cause that turn on the impossibility of Chapter 11 relief. See 11 U.S.C. S 1112(b). The same is not necessarily true in all bad faith cases. Two forms of bad faith can make a Chapter 11 petition objectionable. One involves either pre- or post-petition misconduct by the debtor. In such cases, where the debtor otherwise properly belongs in bankruptcy, dismissal need not always follow from a finding of bad faith stemming from such misconduct. See 7 Collier on Bankruptcy 1112-70 (15th ed. 1996) ("[I]n many circumstances, the court might be better advised to address the bad conduct of the debtor (or some other party) in a manner other than through dismissal of the proceedings."). In bad faith cases involving the filing of a petition that is an abuse of the bankruptcy process, however, S 1112(b)'s conversion/dismissal choice is inappropriate. The proponent of an abusive petition does not belong in bankruptcy so it is unnecessary to ask whether dismissal or conversion is in the interest of the creditors.

Brown--Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. S 1112(b) unlessfiled in good faith.

Four factors guide our adoption of a good faith standard --the permissive language of S 1112(b), viewed in light of its legislative history; the decisions of our sister courts of appeals; the equitable nature of bankruptcy; and the purposes underpinning Chapter 11.

We begin with 11 U.S.C. S 1112(b), which allows the court to dismiss or convert a Chapter 11 petition for cause

        including--

         (1) continuing loss to or diminution of the es tate
        and absence of a reasonable likelihood of
        rehabilitation;

         (2) inability to effectuate a plan;

         (3) unreasonable delay by the debtor that is
        prejudicial to the creditors;

         (4) failure to propose a plan [of reorganiz ation]
        within any time fixed by the court;

         (5) denial of confirmation of every proposed  plan
        and denial of a request made for additional time for
        filing another plan or a modification of a plan;

         (6) revocation of an order of confirmation u nder
        section 1144 of this title, and denial of confirmation
        of another plan or a modified plan under section
        1129 of this title;

         (7) inability to effectuate substantial
        consummation of a confirmed plan;

         (8) material default by the debtor with respec t to a
        confirmed plan;

         (9) termination of a plan by reason of the
        occurrence of a condition specified in the plan; or

         (10) nonpayment of any fees or charges require d
        under chapter 123 of title 28.

11 U.S.C. S1112(b). As many courts and commentators have noted, this language neither requires nor prohibits

imposition of a "good faith" requirement on Chapter 11 petitions. But we have noted the provision that"cause" "includ[es]" the ten enumerated factors strongly suggests those factors are not exhaustive and that a court may consider whether other facts and circumstances qualify as "cause." See Brown, 951 F.2d at 572; 7 Collier on Bankruptcy at 1112-20. That interpretation of S 1112(b) is strengthened by the statute's legislative history, which provides in part:

> [The] list [contained in S 1112(b)] is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.

H.R.Rep. No. 595, at 405, reprinted in 1978 U.S.S.C.A.N. 5963, 6362. The Bankruptcy Code's rules of construction, which provide that "include" and "including" are not limiting terms, also support an expansive reading of S 1112(b). See 11 U.S.C. S 102(3). Section 1112(b), by its terms, therefore, does not preclude consideration of unenumerated factors in determining "cause."

We also note the courts of appeals that have considered the issue have held that the absence of good faith constitutes "cause" to dismiss a Chapter 11 petition under S 1112(b). See, e.g., Trident Assocs. Ltd. Partnership v. Metropolitan Life Ins. Co. (In re Trident Assocs. Ltd. Partnership), 52 F.3d 127, 130 (6th Cir. 1995); Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828 (9th Cir. 1994); Humble Place Joint Ventures v. Foray (In re Humble Place Joint Venture), 936 F.2d 814, 816 (5th Cir. 1991); First Nat'l Bank of Sioux City v. Kerr (In re Kerr), 908 F.2d 400, 404 (8th Cir. 1990); Phoenix Piccadilly, Ltd. v. Life Ins. Co. (In re Phoenix Piccadilly, Ltd.), 849 F.2d 1393, 1394 (11th Cir. 1988). In addition, several other courts of appeals have concluded that Chapter 11 imposes a general good faith requirement under which petitions can be dismissed for bad faith. See, e.g., C-TC 9th Ave. Partnership v. Norton Co. (In re C-TC 9th Ave. Partnership), 113 F.3d 1304 (2d Cir. 1997); Carolin Corp. v. Miller, 886 F.2d 693, 698 (4th Cir. 1989); Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.), 709 F.2d 762, 764 (1st Cir. 1983) (Breyer, J.). Numerous district and bankruptcy courts have reached

11

the same conclusion under either or both approaches. See Carlos J. Cuevas, Good Faith and Chapter 11: Standard that Should Be Employed to Dismiss Bad Faith Chapter 11 Cases, 60 Tenn. L. Rev. 525 (1993).9

The "good faith" requirement for Chapter 11 petitioners has strong roots in equity. The court in In re Victory Construction Co., Inc., in first articulating the good faith requirement under the current Bankruptcy Code, highlighted the equitable nature of the doctrine when it explained:

> Review and analysis of [the bankruptcy laws and relevant cases] disclose a common theme and objective [underlying the reorganization provisions]: avoidance of the consequences of economic dismemberment and liquidation, and the preservation of ongoing values in a manner which does equity and is fair to rights and interests of the parties affected. But the perimeters of this potential mark the borderline between fulfillment and perversion; between accomplishing the objectives of rehabilitation and reorganization, and the use of these statutory provisions to destroy and undermine the legitimate rights and interests of those intended to benefit by this statutory policy. That borderline is patrolled by courts of equity, armed with the doctrine of "good faith" . . . .

9 B.R. 549, 558 (Bankr. C.D. Calif. 1981) order stayed Hadley v. Victory Construction Co., Inc. (In re Victory Construction Co., Inc.), 9 B.R. 570 (Bankr. C.D. Calif. 1981). A debtor who attempts to garner shelter under the Bankruptcy Code, therefore, must act in conformity with the Code's underlying principles. See Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.), 779 F.2d 1068, 1076 (5th Cir. 1986) ("[A] good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons

_____

9. We need not dwell on the fine distinctions between the two closely related approaches. See 7 Collier on Bankruptcy at 1112-62-1112-64. Despite analytic differences, the conclusion of every court of appeals to address the issue is clear--Chapter 11 petitions must be filed in good faith or they are subject to dismissal.

12

. . . available only to those debtors and creditors with `clean hands.' "); see also 7 Collier on Bankruptcy at 1112-68 ("Another basic underpinning of the good faith doctrine is the equitable concept of `clean hands.' As a general matter, bankruptcy relief is equitable in nature, and, as a general rule, equitable remedies are not available to any party who fails to act in an equitable fashion.").

Finally, we believe a good faith requirement is supported by the purposes underlying Chapter 11. As the Court of Appeals for the Fifth Circuit noted,

> [A good faith standard] furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy. Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way . . . .

In re Little Creek, 779 F.2d at 1072; see also Carolin, 886 F.2d at 698 (stating that court's ability to impose good faith requirement is "indispensable to proper accomplishment of the basic purposes of Chapter 11 protection").

After considering the language of S 1112(b), its legislative history, the decisions of other courts of appeals, the equitable nature of bankruptcy proceedings, and the purposes behind Chapter 11, we conclude a Chapter 11 petition is subject to dismissal for "cause" under 11 U.S.C. S 1112(b) unless it is filed in good faith.

B.

Having determined that S 1112(b) imposes a good-faith requirement on Chapter 11 petitions, we consider whether SGL Carbon's Chapter 11 petition was filed in good faith.10
_____

10. Once at issue, the burden falls upon the bankruptcy petitioner to establish that the petition has been filed in"good faith." See, e.g., In re
Fox, 232 B.R. 229, 233 (Bankr. D. Kan. 1999); Stage I Land Co. v. United States, 71 B.R. 225, 229 (D. Minn. 1986). See also 7 Collier on Bankruptcy at 1112-53 ("[I]f the issue is whether the petition was filed in good faith, the burden rests on the petitioner.").

13

The requisite fact intensive inquiry requires determining where SGL Carbon's petition falls along the spectrum ranging from the clearly acceptable to the patently abusive. We first review the District Court's findings of fact and then examine the totality of facts and circumstances to determine whether they support a finding of good faith. See In re Trident, 52 F.3d at 131; In re Marsch, 36 F.3d at 829; In re Laguna, 30 F.3d at 738.

i.

As discussed in part I, the District Court found SGL Carbon's Chapter 11 petition was filed in good faith for two reasons: first, because the distractions caused by the antitrust litigation "posed a serious threat to[SGL Carbon's] continued successful operations," and second, because the litigation might result in a judgment that could cause the company "financial and operational ruin," SGL was required to file when it did. SGL Carbon, 233 B.R. at 291. Although mindful of the careful consideration given by the able District Court, we believe each of thesefindings of fact was clearly erroneous.11

Although there is some evidence that defending against the antitrust litigation occupied some officers' time, there is no evidence this "distraction" posed a "serious threat" to the company's operational well being. At his deposition, Theodore Breyer12 testified the antitrust litigation consumed a significant portion of his time. But Breyer also noted the Carbon/Graphite Business Unit had met all of itsfinancial targets during the nine months preceding filing. Additionally, Breyer testified that only his business unit was heavily involved in the antitrust litigation, recognizing that any management distraction effecting the rest of SGL Carbon resulted from the bankruptcy filing and not the antitrust litigation. As noted, SGL AG and SGL Carbon

_____

11. Although we conclude these findings were clearly erroneous, we do not hold that under the proper circumstances managerial distraction and other litigation harms may not constitute factors contributing to good faith.

12. As noted, Breyer is the Vice President in charge of SGL Carbon's North American Carbon/Graphite Business Unit.

14

officers insisted the company was financially healthy despite the litigation. In addition, SGL AG's Chairman denied that the litigation was having a "material negative impact on [SGL Carbon's] operations." In light of all the evidence, we believe the District Court's finding to the contrary is mistaken. See United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948).

We also find clearly erroneous that SGL Carbon's Chapter 11 petition was filed at the appropriate time to avoid the possibility of a significant judgment that "could very well force [SGL Carbon] out of business." There is no evidence that the possible antitrust judgments might force SGL Carbon out of business. To the contrary, the record is replete with evidence of SGL Carbon's economic strength. At the time of filing, SGL Carbon's assets had a stipulated book value of $400 million, only $100,000 of which was encumbered. On the date of the petition, SGL Carbon had $276 million in fixed and non-disputed liabilities. Of those liabilities, only $26 million were held by outsiders as the remaining liabilities were either owed to or guaranteed by SGL AG. Although SGL Carbon's parent, SGL AG, recorded a $240 million charge on its books as "its best estimate of the potential liability and expenses of the SGL Carbon Group in connection with all civil and criminal antitrust matters," SGL Carbon is only one part of the SGL Carbon Group covered by the reserve. Furthermore, at the time SGL Carbon filed its petition, that is, before SGL AG paid its $135 million criminal fine, the $240 million reserve was untouched. In documents accompanying its petition, SGL Carbon estimated the liquidation value of the antitrust claims at $54 million. In contrast, no evidence was presented with respect to the amount sought by the antitrust plaintiffs beyond SGL Carbon's repeated characterization of their being "unreasonable."

Whether or not SGL Carbon faces a potentially crippling antitrust judgment, it is incorrect to conclude it had to file when it did. As noted, SGL Carbon faces no immediate financial difficulty. All the evidence shows that management repeatedly asserted the company was financially healthy at the time of the filing. Although the District Court believed the litigation might result in a judgment causing "financial

15

and operational ruin" we believe that on the facts here, that assessment was premature. A Chapter 11 petition would impose an automatic stay on all efforts to collect the judgment and would allow the company the exclusive right to formulate a reorganization plan under which the amount of the judgment could be adjusted to allow the company to reorganize. SGL Carbon has offered no evidence it could not effectively use those protections as the prospect of such a judgment became imminent.13 The District Court's finding that the petition had to be filed at that particular time to avoid financial ruin and therefore was made in good faith is clearly contradicted by the evidence.

The District Court was correct in noting that the Bankruptcy Code encourages early filing. See SGL Carbon, 233 B.R. at 291. It is well established that a debtor need not be insolvent before filing for bankruptcy protection. See, e.g., In re The Bible Speaks, 65 B.R. 415, 424 (Bankr. D. Mass. 1986); In re Talladega Steaks, Inc., 50 B.R. 42, 44 (Bankr. N.D. Ala. 1985). See also Daniel R. Cowans, Bankruptcy Law and Practice (7th ed. 1998) 232. It also is clear that the drafters of the Bankruptcy Code understood the need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation.14 Such encouragement, however, does not open the door to premature filing, nor does it allow for the filing of a bankruptcy petition that lacks a valid reorganizational purpose. See, e.g., In re Marsch, 36 F.3d at 838; In re Coastal Cable, 709 F.2d at 764; In re Ravick Corp., 106 B.R. 834, 843 (Bankr. D.N.J. 1989).

SGL Carbon, therefore, is correct that the Bankruptcy Code does not require specific evidence of insolvency for a

_____

13. The Texaco Corporation's use of the bankruptcy protections is instructive. See In re Texaco, Inc., 84 B.R. 893 (Bank. S.D.N.Y. 1988). Texaco resorted to bankruptcy only after suffering an $11 billion judgment. Even saddled with such a large judgment, bankruptcy provided Texaco a means of reorganizing and continuing as a going concern.

14. See, e.g., Alan N. Resnick, Bankruptcy As A Vehicle for Resolving Enterprise-Threatening Mass Tort Liability, 148 U. Pa. L. Rev. ____ (forthcoming 2000) M12.

16

voluntary Chapter 11 filing. But SGL Carbon cites no case holding that petitions filed by financially healthy companies cannot be subject to dismissal for cause. At any rate, as we explain more fully, SGL Carbon's ability to meet its debts is but one of many factors compelling the conclusion it did not enter Chapter 11 with a valid reorganizational purpose.

We do not hold that a company cannot file a valid Chapter 11 petition until after a massive judgment has been entered against it. Courts have allowed companies to seek the protections of bankruptcy when faced with pending litigation that posed a serious threat to the companies' long term viability. See, e.g., Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal Inc.), 931 F.2d 222 (2d Cir. 1991); In re The Bible Speaks, 65 B.R. 415 (Bankr. D. Mass. 1986); In re Johns-Manville, 36 B.R. 727 (Bankr. S.D.N.Y. 1984). In those cases, however, debtors experienced serious financial and/or managerial difficulties at the time of filing. In Cohoes, the Court of Appeals for the Second Circuit found a good faithfiling, in part, because "it [was] clear that Cohoes[the debtor] was encountering financial stress at the time it filed its petition . . . ." 931 F.2d at 228. In Bible Speaks, pending litigation had already had an adverse effect on the debtor'sfinancial well being as it was experiencing "a cash flow problem which prevent[ed] it from meeting its current obligations," compounded by an inability to obtain financing. 65 B.R. at 426. In Johns-Manville, the debtor was facing significant financial difficulties. A growing wave of asbestos-related claims forced the debtor to either book a $1.9 billion reserve thereby triggering potential default on a $450 million debt which, in turn, could have forced partial liquidation, or file a Chapter 11 petition. See In re Johns-Manville, 36 B.R. at 730. Large judgments had already been entered against Johns-Manville and the prospect loomed of tens of thousands of asbestos health-related suits over the course of 20-30 years.15 See id. at 729. See also Sandrea

_____

15. A large number of pending or potential claims also contributed to two other mass tort related bankruptcy petitions. The 1985 bankruptcy petition of the A.H. Robins Company came only after"the Company had settled 9,238 claims for approximately $530,000,000" and "still faced

Friedman, Note, Manville: Good Faith Reorganization or "Insulated" Bankruptcy, 12 Hofstra L. Rev. 121 (1983).

For these reasons, SGL Carbon's reliance on those cases is misplaced. The mere possibility of a future need to file, without more, does not establish that a petition wasfiled in "good faith." See, e.g., In re Cohoes Indus. Terminal Inc., 931 F.2d at 228 ("Although a debtor need not be in extremis in order to file [a Chapter 11] petition, it must, at least, face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future."). SGL Carbon, by its own account, and by all objective indicia, experienced no financial difficulty at the time of filing nor any significant managerial distraction. Although SGL Carbon may have to file for bankruptcy in the future, such an attenuated possibility standing alone is not sufficient to establish the good faith of its present petition.

ii.

We also consider whether other evidence establishes the good faith of SGL Carbon's petition, that is, whether the totality of facts and circumstances support a finding of good faith. Courts have not been unanimous about what constitutes "good faith" in the Chapter 11filing context. See, e.g., In re Trident, 52 F.3d at 131 (setting forth eight factors for courts to consider); In re Marsch, 36 F.3d at 828–29 (describing different approaches); In re Kerr, 908 F.2d at 404 (defining "bad faith" as "a pattern of concealment, evasion, and direct violations of the Code or court order which clearly establishes an improper motive . . . ."); Carolin, 886 F.2d at 700–02 (examining approaches of other courts and holding a petition lacks good faith if

_____

over five thousand pending cases in state and federal court." In re A.H. Robins, 89 B.R. 555, 557 (Bankr. E.D. Va. 1988). Similarly, at the time it filed for bankruptcy Dow Corning Corporation faced 440,000 potential claimants which had resulted in the filing of more than "19,000 individual silicone–gel breast implant lawsuits and at least 45 putative silicone–gel breast implant class actions." In re Dow Corning Corp., 211 B.R. 545, 553 (Bankr. E.D. Mich. 1997). See also Richard L. Marcus & Edward F. Sherman, Complex Litigation (3d ed. 1998) 205-07.

18

reorganization is objectively futile and if petitioner displays subjective bad faith); In re Phoenix Piccadilly , 849 F.2d at 1394 (noting that courts may consider "any factors which evidence `an intent to abuse the judicial process and the purposes of the reorganization provisions' or . . . factors which evidence that the petition was filed `to delay or frustrate the legitimate efforts of secured creditors to enforce their rights' " (citations omitted)); In re Little Creek Dev. Co., 779 F.2d at 1072-73 (5th Cir. 1986) (instructing bankruptcy courts to consider "the debtor's financial condition, motives, and the local financial realities"). See also Cuevas, supra, at 529 (noting different approaches).

Despite those differing approaches, several cases hold that a Chapter 11 petition is not filed in good faith unless it serves a valid reorganizational purpose. See, e.g., In re Marsch, 36 F.3d at 828; In re Coastal Cable, 709 F.2d at 764 (stating that there must be "some relation" between filing and the "reorganization-related purposes that [Chapter 11] was designed to serve"); In re Ravick Corp., 106 B.R. 834, 843 (Bankr. D.N.J. 1989). Similarly, because filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within "the legitimate scope of the bankruptcy laws," In re Marsch, 36 F.3d at 828, courts have typically dismissed Chapter 11 petitions under these circumstances as well. See id.; In re Argus Group 1700, Inc., 206 B.R. 757, 765-66 (E.D. Pa. 1997); Furness v. Lilienfield, 35 B.R. 1006, 1013 (D. Md. 1983) ("The Bankruptcy provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation."); In re HBA East, Inc., 87 B.R. 248, 259-60 (Bankr. E.D.N.Y. 1988) ("As a general rule where, as here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not beingfiled in good faith."); In re Martin, 51 B.R. 490, 495 (Bankr. M.D. Fla. 1985). The In re Marsch Court articulated the relationship between the good faith determination and the dismissal of petitions filed merely for tactical advantage:

> The term "good faith" is somewhat misleading. Though it suggests that the debtor's subjective intent is

19

determinative, this is not the case. Instead, the"good
faith" filing requirement encompasses several, distinct
equitable limitations that courts have placed on
Chapter 11 filings. Courts have implied such
limitations to deter filings that seek to achieve
objectives outside the legitimate scope of the
bankruptcy laws. Pursuant to 11 U.S.C. S 1112(b),
courts have dismissed cases filed for a variety of
tactical reasons unrelated to reorganization.

In re Marsch, 36 F.3d at 828 (citations omitted).

It is easy to see why courts have required Chapter 11
petitioners to act within the scope of the bankruptcy laws
to further a valid reorganizational purpose. Chapter 11
vests petitioners with considerable powers--the automatic
stay, the exclusive right to propose a reorganization plan,
the discharge of debts, etc.--that can impose significant
hardship on particular creditors. When financially troubled
petitioners seek a chance to remain in business, the
exercise of those powers is justified. But this is not so when
a petitioner's aims lie outside those of the Bankruptcy
Code. See United Sav. Ass'n v. Timbers of Inwood Forest
Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.),
808 F.2d 363, 373 (5th Cir. 1987) (en banc), aff'd, 484
U.S. 365 (1988) (stating that if Chapter 11 plan does not
have a rehabilitative purpose, the "statutory provisions
designed to accomplish the reorganizational objectives
become destructive of the legitimate rights and interests of
creditors"); In re Little Creek, 779 F.2d at 1072 (explaining
that Chapter 11 powers should be given only to debtors
with "clean hands"); Furness, 35 B.R. at 1009 ("Chapter 11
was designed to give those teetering on the verge of a fatal
financial plummet an opportunity to reorganize on solid
ground and try again, not to give profitable enterprises an
opportunity to evade contractual or other liabilities."); see
also 7 Collier on Bankruptcy at 1112-22 (stating that
dismissal is appropriate when costs of Chapter 11 are not
justified).

Courts, therefore, have consistently dismissed Chapter
11 petitions filed by financially healthy companies with no
need to reorganize under the protection of Chapter 11. See
In re Marsch, 36 F.3d at 828-29; In re Argus Group 1700,

206 B.R. at 765–66; Furness, 35 B.R. at 1011–13; In re Talladega Steaks, Inc., 50 B.R. 42, 44 (Bankr. N.D. Ala. 1985). Those courts have recognized that if a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilititative purpose for which Chapter 11 was designed. See In re Winshall Settlor's Trust, 758 F.2d 1136, 1137 (6th Cir. 1985) ("The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state."); see also S. Rep. No. 95–989, at 9 reprinted in 1978 U.S.C.C.A.N. 5787, 5795 (noting that "Chapter 11 deals with the reorganization of a financially distressed enterprise . . . ").

The absence of a valid reorganizational purpose [16] and the consequent lack of good faith by SGL Carbon is evident here. SGL Carbon's financial disclosure documents give no indication the company needed to reorganize under Chapter 11 protection. Prior to filing, SGL Carbon had assets of $400 million and liabilities of only $276 million, or a net worth of $124 million. In addition, there is no evidence that SGL Carbon had difficulty meeting its debts as they came due, that it had any overdue debts, or that it had defaulted on any debts. Nor is there any evidence that SGL had any difficulty raising or borrowing money, or otherwise had impaired access to the capital markets.

Statements by SGL Carbon and its officials confirm the company did not need to reorganize under Chapter 11. As discussed, in a press release issued when SGL Carbonfiled its petition, the company's president insisted SGL Carbon was "financially healthy" and that its "normal business operations" would continue despite bankruptcy. In addition, SGL AG's Chairman Robert Koehler stated in a conference call with securities analysts that SGL Carbon was experiencing "healthy and growing success" and denied that the class action antitrust litigation was materially interfering with SGL Carbon's operations or its customer

_____

16. By focusing on whether there is a valid reorganization purpose, we do not hold that a lack of good faith is limited to this situation. Indeed,
"no list is exhaustive of all the factors which could be relevant when analyzing a particular debtor's good faith." In re Laguna, 30 F.3d at 738.

21

relationships. Koehler added that unlike most Chapter 11 cases, SGL Carbon's petition did not involve "serious insolvency or credit problems." SGL Carbon Vice President Theodore Breyer acknowledged in his deposition that SGL Carbon had no defaults nor any financial distress when it filed for Chapter 11.

An examination of the reorganization plan SGL Carbon filed simultaneously with its Chapter 11 petition also suggests the petition was not motivated by a desire to reorganize or rehabilitate SGL Carbon's business. 17 Under the proposed plan, all creditors—including SGL Carbon's parent SGL AG—other than civil antitrust judgment creditors are to be paid in full in cash. Antitrust judgment creditors, by contrast, would be required to accept limited-time credits to purchase SGL Carbon's products. 18 The plan's differing treatment of creditors suggests SGL Carbon's petition was not filed to reorganize the company but rather to put pressure on antitrust plaintiffs to accept the company's settlement terms.19

_____

17. Although the "good faith" of the reorganization plan is not before this
court, the features of the proposed plan help illuminate the lack of good faith in the filing. Using the plan to reason backwards concerning SGL Carbon's motivations is consistent with the practices of bankruptcy courts. As one bankruptcy court has noted:

> Much of the case law on good faith draws heavily upon the time-honored method of analyzing and establishing a nexus between cause and effect. Long a modus habilis not only in bankruptcy but in criminal and tort law and in virtually any legal inquiry where intent is an issue, this sort of posteriori inquiry permits courts to
> work backwards from effect to cause—to reason, that is, that if the
> probable effect of a reorganization plan is to treat unfairly of creditors, then the probable cause of the filing was bad faith.

In re Kahn, 34 B.R. 574, 575 (Bankr. W.D. Ky. 1983).

18. Although the plan is not at issue, we note that an analogous arrangement was held inappropriate as a means of resolving an action in a nonbankruptcy context. See In re General Motors Corp. Pick-up Truck Fuel Tank Products Liability, 55 F.3d 768 (3d Cir. 1995).

19. Although it is true the proposed plan would be subject to a separate "good faith" determination by the bankruptcy court before it could implemented, see 11 U.S.C. S 1129(a)(3), that is only appropriate if the

22

Comments made by SGL Carbon and SGL AG officers support that view of SGL Carbon's motives for filing for Chapter 11. Those officers expressly and repeatedly acknowledged Chapter 11 petition was filed solely to gain tactical litigation advantages. See, e.g., December 17, 1998 Press Release; Koehler Conference Call of December 17, 1998 ("We are [filing] merely . . . because of the excessive demands [of litigants]."); Breyer Deposition (filing for Chapter 11 would "change the negotiating platform" and "increase the pressure on . . . plaintiffs to settle"). In addition, under the heading "Factors Leading to the Chapter 11 Filing," SGL Carbon's bankruptcy Disclosure Statement discusses only the civil antitrust litigation and the difficulties it was having in reaching a settlement with the remaining plaintiffs.

On appeal, SGL Carbon plays down the litigation tactics behind its Chapter 11 petition and instead claims it was forced into Chapter 11 by serious economic difficulty stemming from the litigation. The company alleges this difficulty came in three forms: harmful distraction of its management, the possibility that the litigation would result in a judgment that "could very well force [SGL Carbon] out of business," and harm to its customer relationships with plaintiffs. Because we have already concluded thefirst two arguments are not supported by the facts, we will address only the third.

We are not convinced by SGL Carbon's claim that a Chapter 11 filing was necessary because we see no evidence the antitrust litigation was significantly harming its business relationships with the antitrust plaintiffs. For example, none of SGL Carbon's officers stated that any customer terminated its purchases from the company

_____

bankruptcy petition properly belongs before the bankruptcy court. In a case, such as this one, where a debtor attempts to abuse the bankruptcy process, proceedings should end well before formal consideration of the plan. Cf. In re Metropolitan Realty Corp., 433 F.2d 676, 679 (5th Cir. 1970) ("As soon as the lack of good faith affirmatively appeared, the district court acted properly in dismissing the petition even though the plan stage had not been reached.").

because of the litigation.[20] As noted, SGL AG Chairman Koehler denied the litigation was having a material impact on SGL Carbon's customer relationships. We note that SGL Carbon offered no evidence (testamentary or otherwise) from any customer on this issue. It is also significant that SGL Carbon's Disclosure Statement, which accompanied its petition, does not mention harm to customer relationships. Nor did SGL Carbon attempt to explain how filing for Chapter 11 would improve its customer relationships. As noted, many of those customers are plaintiffs in the antitrust litigation. Moreover, the evidence before the District Court indicated SGL Carbon's customers eliminated their orders only after the Chapter 11 petition wasfiled, suggesting it was the petition, rather than the litigation, that caused the harm of which the company now complains. After sifting through the evidence, the only support for SGL Carbon's argument are its conclusory allegations. We do not believe those suffice.

SGL Carbon places great emphasis on In re The Bible Speaks, 65 B.R. 415 (Bankr. D. Mass. 1986), and In re Johns-Manville, 36 B.R. 727 (Bankr. S.D.N.Y. 1984), two bankruptcy court cases relied on by the District Court.[21] After considering those cases, we conclude they are not dispositive.

SGL Carbon cites In re The Bible Speaks to support its argument that the prospect of a significant litigation judgment by itself establishes the good faith of a Chapter 11 petition. But the litigation in Bible Speaks posed substantially different problems than does the antitrust litigation here. In Bible Speaks, the bankruptcy court found

_____

20. In fact, SGL Carbon Vice President Breyer testified that he could only be certain that one customer had even reduced its purchases from SGL Carbon prior to its Chapter 11 petition. Maintaining that a second customer may also have reduced its purchases, Breyer could not say why either customer had reduced its purchases. Significantly, Breyer testified that no customer had terminated its relationship with SGL Carbon until after the filing.

21. We note that SGL Carbon has not supported its argument that pending litigation establishes the good faith of a Chapter 11 filing with any cases from this circuit, or, indeed, any cases other than the distinguishable Bible Speaks and Johns-Manville.

the litigation had "already produced a significant effect" on the debtor; because of the uncertainty surrounding the litigation, the debtor was "unable to obtainfinancing." 65 B.R. at 426. SGL Carbon has not alleged the antitrust litigation has had a similar effect and such evidence is absent from the record. In addition, the court in Bible Speaks found that a significant judgment in the litigation would "probably terminate [the debtor's] existence." Id. There is no evidence SGL Carbon could not effectively use Chapter 11 following a judgment in the antitrust litigation. Also, the court found the litigation prevented the debtor in Bible Speaks from making "financing [arrangements] or any type of long range plans." Id. at 427. SGL Carbon has not alleged the antitrust litigation has impeded itsfinancing or planning activities; instead, the petitioner has repeatedly insisted the litigation has had no material effect on its operations. Finally, the court in Bible Speaks found that dismissal was not warranted because Chapter 11 was in the best interests of the debtor and its creditor. See id. at 429. There is no such finding in this case.

We also believe reliance on In re Johns–Mansville is misplaced. As an initial matter, the Johns–Manville Court had a narrow view of what constitutes "good faith." After expressing doubt that S 1112(b) imposes a good-faith requirement in all Chapter 11 cases, see 36 B.R. at 737, the court suggested that a Chapter 11 petition lacks good faith only if filed by a creditor-less company formed as a sham solely for the purpose of filing a bankruptcy petition, by a company that never operated legitimately, or by a company wishing to forestall tax liability or deed of trust powers. See id. at 737–38. As noted, most of the courts of appeals believe other facts and circumstances may evidence lack of good faith.

Johns–Mansville is also factually distinguishable. In Johns–Manville, the bankruptcy court found the company had a "compelling" and "pressing" need to reorganize. Id. at 730. As we have explained, SGL Carbon has no such need.22

_____

22. For example, the Johns–Manville Court noted that the company would have had to book a $1.9 billion tort liability reserve had it not filed for Chapter 11. See id. at 730. This booking would in turn have accelerated $450 million in outstanding debt and could have forced liquidation. SGL Carbon has not shown the failure tofile for Chapter 11 would cause it such harm.

25

Prior to the Chapter 11 filing, the Johns Manville plaintiffs had recovered nearly $4 million in punitive damages against the company. See In re Johns-Manville, 36 B.R. 743, 746 (Bankr. S.D. N.Y. 1984). The litigation effected by SGL's Chapter 11 petition, in contrast, is in its nascent stages. Johns-Manville faced "approximately 16,000 lawsuits pending as of the filing date" with the prospect of the "filing of an even more staggering number of suits" over the course of 20-30 years. Johns-Manville, 36 B.R. at 729. By contrast, SGL Carbon faces a known and finite number of suits. In addition, the Johns-Manville Court made clear that its decision was based on factors other than the debtor's financial health. Unlike this case, the Johns-Manville creditors pursued their motion only after sixteen months of bargaining over an acceptable reorganization plan resulted in a deadlock. In denying the creditors' motion to dismiss, the court stated it would "bear in mind the strategical motivations underlying [creditors'] pursuit of these motions at this time" and would recognize "the progress toward a successful, perhaps consensual, reorganization that has already taken place." Id. at 731. The Official Committee of Unsecured Creditors here did not delay in filing the motion to dismiss SGL Carbon's Chapter 11 petition; nor does SGL Carbon allege the creditors' motion was spurred by an intent to extract concessions in stalled negotiations. This case, therefore, involves neither the creditors' "strategical motivations" nor the "progress towards a successful . . . reorganization" that colored the Johns-Manville Court's opinion. Id.

Based on the facts and circumstances of this case, we conclude SGL Carbon's Chapter 11 petition lacks a valid reorganizational purpose and consequently lacks good faith making it subject to dismissal "for cause" under 11 U.S.C. S 1112(b).23

_____

23. Because we conclude SGL Carbon's petition should be dismissed, we need not address the creditors' argument that the failure to dismiss would deprive it of its Seventh Amendment right to try its antitrust claims before a jury.

26

C.

In reaching our conclusion, we are cognizant that it is growing increasingly difficult to settle large scale litigation. See, e.g., Ortiz v. Fibreboard Corp., 119 S.Ct. 2295 (1999); Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997). We recognize that companies that face massive potential liability and litigation costs continue to seek ways to rapidly conclude litigation to enable a continuation of their business and to maintain access to the capital markets. As evidenced by SGL Carbon's actions in this case, the Bankruptcy Code presents an inviting safe harbor for such companies. But this lure creates the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings. Allowing SGL Carbon's bankruptcy under these circumstances seems to us a significant departure from the use of Chapter 11 to validly reorganize financially troubled businesses.

IV.

For the reasons stated, we will reverse the judgment of the District Court and remand to the District Court so that it may dismiss SGL Carbon's Chapter 11 petition.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

27