In re PRIMESTONE INVESTMENT
PARTNERS L.P., Debtor.

Primestone Investment Partners
L.P., Appellant,

v.

Vornado PS, L.L.C., Appellee.

No. 01–11355–MFW.
Civ.A. No. 02–001–SLR.

United States District Court,
D. Delaware.

Jan. 28, 2002.

Gregory W. Werkheiser, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Primestone Investment Partners, LP.

Mark David Collins, Richards, Layton & Finger, Wilmington, DE, for Vornado PS LLC.

Frank J. Perch, III, U.S. Trustee, Philadelphia, PA, pro se.

## MEMORANDUM ORDER

ROBINSON, District Judge.

At Wilmington this 28th day of January, 2002, having reviewed the papers submitted and heard oral argument in connection with the above captioned appeal;

IT IS ORDERED that the December 18, 2001 order entered by the Honorable Mary F. Walrath dismissing the case filed under Chapter 11 of the Bankruptcy Code by appellant Primestone Investment Partners L.P. ("Primestone") is affirmed and the appeal denied, for the reasons that follow:

1. **Jurisdiction.** This court has jurisdiction to decide the instant appeal pursuant to 28 U.S.C. § 158(a).

2. **Standard of review.** Section 1112(b) of Title 11 of the United States Code provides that a court may dismiss a Chapter 11 case "for cause" if it is in the best interest of the creditors and the estate. The United States Court of Appeals for the Third Circuit has held that a Chapter 11 petition may be dismissed for cause if it was not filed in "good faith." *In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir.1999). Once at issue, it is the petitioner's burden to establish "whether the totality of facts and circumstances support a finding of good faith." *Id.* at 162 n. 10, 165. The "good faith" determination "is committed to the sound discretion of the bankruptcy or district court and will be reviewed for abuse of discretion." *Id.* at 159.

3. **Facts.** Appellant Primestone is a Delaware limited partnership that was established for the purpose of acquiring, holding, exchanging, or otherwise disposing of limited partnership units (the "Prime Units"). Primestone currently owns 7,944,893 Prime Units, with such Prime Units being exchangeable on a one-for-one basis into common shares of beneficial interest in Prime Group Realty Trust ("PGE"), a Maryland real estate trust, the shares of which are publicly traded on the New York Stock Exchange. PGE is the managing general partner of Prime Group Realty, L.P. ("PGRLP"), a Delaware limited liability partnership through which PGE conducts its business and holds substantially all of its assets. PGE and its affiliates own, manage, lease, develop, and redevelop, directly or indirectly, office and industrial real estate, primarily in the Chicago metropolitan area. The Chicago metropolitan portfolio currently consists of 27 office properties, containing an aggregate of approximately 10.6 million net rentable square feet and 30 industrial properties containing an aggregate of approximately 3.9 million net rentable square feet.

4. Appellee Vornado PS, L.L.C. ("Vornado") is a wholly owned subsidiary of Vornado Realty, L.P., the operating partnership of Vornado Realty Trust, a publicly traded real estate investment trust. Pursuant to a Loan Agreement dated Sep-

tember 26, 2000 (the "Vornado Loan Agreement"), Vornado loaned $62 million to Primestone (the "Vornado Loan"). The Vornado Loan was evidenced by a promissory note and was guaranteed by five affiliates of Primestone (the "Guarantors"). To secure the Vornado Loan, Primestone pledged the Prime Units. The Vornado Loan Agreement provided for a payment of $2.1 million upon repayment of the principal and a maturity date of October 25, 2001.

5. At the time Vornado extended its loan to Primestone, Primestone was indebted to P–B Finance Ltd. ("P–B Finance"), an affiliate of Prudential Securities Group, Inc., for the principal amount of $40 million (the "Prudential Loan"; together with the Vornado Loan, the "Loans"). The Prudential Loan also was secured by the Prime Units and was senior to the Vornado Loan. When the Vornado Loan was made, P–B Finance and Vornado entered into, *inter alia*, an Intercreditor Agreement dated as of September 26, 2000 (the "Intercreditor Agreement"), in order to establish the relative rights of P–B Finance and Vornado as between one another. The maturity of the Prudential Loan originally was September 25, 2001, but was extended by P–B Finance until the earliest of (1) November 30, 2001, (2) repayment of the Vornado Loan, or (3) a change in control of, *inter alia*, Primestone. Under the Intercreditor Agreement, Vornado's consent was required for this extension, and Vornado provided its consent in a Consent and Agreement, dated October 26, 2001.

6. On October 25 2001, payment of the Vornado Loan was demanded. Primestone failed to pay. Vornado contends that this constituted an event of default under the Vornado Loan Agreement and a default under cross-default provisions of the Prudential Loan Agreement. In addition, the Prudential Loan Agreement pro-

vided that P–B Finance could require Primestone to furnish additional collateral if the trading price of the shares into which the Prime Units are exchangeable fell below $14.50. On October 26, 2001, after the New York Stock Exchange trading price of the shares closed at $9.85, P–B Finance delivered a notice requiring Primestone to provide additional collateral. Primestone failed to meet the margin call, and this event matured on October 30, 2001 into a second alleged default under the Prudential Loan Agreement, which in turn constituted a second alleged event of default under the cross-default provisions of the Vornado Loan Agreement.

7. Because the Prudential Loan was senior to Vornado's, Vornado was required to obtain the consent of P–B Finance or purchase the Prudential Loan before enforcing its rights as a secured creditor. P–B Finance did not give its consent, and on October 31, 2001, Vornado purchased the Prudential Loan for $37,978,479.97. On November 29, 2001, an affiliate of Cadim Inc. ("Cadim") purchased a 50 percent participation interest in the principal due under the Loan Agreements, plus interest accrued subsequent to the date of the purchase, for $49,989,240.

8. By a letter dated October 31, 2001, Vornado gave notice to Primestone and the Guarantors that it intended to dispose of the Prime Units at a public auction scheduled for 4:00 p.m. on November 20, 2001. Vornado retained Goldman, Sachs & Co. ("Goldman Sachs") and a licensed auditor to assist it in the auction. Goldman Sachs contacted and distributed information to potentially qualified purchasers of the Prime Units. Notices publicizing the auction appeared in *The New York Times* and in *The Chicago Tribune*.

9. In response to Vornado's actions, Primestone denied that there were any defaults, both in letters to Vornado and in

public filings. Primestone's principal, Michael Reschke, objected to Vornado's auction process as "commercially unreasonable" and proposed an additional nine-week process (including "management roadshows" and property tours) culminating in a multi-round "private" auction. In documents filed with the Securities and Exchange Commission on November 14, 2001, Mr. Reschke indicated that Primestone would contest the defaults and the foreclosure sale and would "pursue such legal procedures or proceedings as [Primestone] may deem appropriate."

10. Vornado commenced litigation against Primestone in the Delaware Court of Chancery on the morning of November 19, 2001. Vornado filed a Verified Complaint for Declaratory and Injunctive Relief that sought, among other things, an order restraining Primestone and its affiliates from interfering with Vornado's enforcement of its security interest in the Prime Units, a declaratory judgment that events of default had occurred under the Loan Agreements, and a declaratory judgment that Vornado had proceeded in a commercially reasonable manner in conducting the sale of the Prime Units.

11. Primestone filed its Chapter 11 petition at 11:51 p.m. on November 19, 2001, 16 hours before the auction. The automatic stay that took effect upon Primestone's Chapter 11 filing stayed both the Chancery court proceeding and the foreclosure sale. The list of the 20 largest unsecured creditors annexed to Primestone's petition did not list any creditors. Vornado filed a motion to dismiss for bad faith based in part on the fact that Primestone had no other creditors. Subsequently, Primestone filed schedules listing five unsecured creditors, with claims totaling, at most, $532,368. These creditors include its affiliate The Prime Group, Inc. and charges from Primestone's accountants and law-

yers. In a footnote to the largest unsecured claim from Primestone's Chicago attorneys, the schedules state that the claim "represents separate billings to The Prime Group, Inc. and affiliates that are partially attributable to the Debtor, the allocation of which is still under review." Primestone's schedules confirm that: (1) the Prime Units are its only asset (other than alleged litigation claims); (2) it has no cash; and (3) it has no operating income.

 12. **Analysis.** In conducting their good faith inquiry, courts typically review the record for evidence of various factors:

 a. Single asset case;

 b. Few unsecured creditors;

 c. No ongoing business or employees;

 d. Petition filed on eve of foreclosure;

 e. Two party dispute which can be resolved in pending state court action;

 f. No cash or income;

 g. No pressure from non-moving creditors;

 h. Previous bankruptcy petition;

 i. Prepetition conduct was improper;

 j. No possibility of reorganization;

 k. Debtor formed immediately prepetition;

 l. Debtor filed solely to create automatic stay; and

 m. Subjective intent of the debtor.

*See In re SGL Carbon,* 200 F.3d at 165; *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394–95 (11th Cir.1988); *In re SB Properties,* 185 B.R. 198, 205 (E.D.Pa.1995). The focus of the inquiry is whether the petitioner sought "to achieve objectives outside the legitimate scope of the bankruptcy laws" when filing for protection under Chapter 11. *In re SGL Carbon,* 200 F.3d at 165 (citing *In re Marsch,* 36 F.3d 825,

828 (9th Cir.1994)). Therefore, "no single factor is determinative of a lack of good faith in filing a petition." *In re Tiffany Square Assocs., Ltd.*, 104 B.R. 438, 441 (Bankr.M.D.Fla.1989).

13. Reviewing the totality of the facts and circumstances of record, the court finds that dismissal of Primestone's petition did not constitute an abuse of discretion. Although the court agrees with Primestone that "there is nothing inherently improper in a single asset debtor filing a Chapter 11 Petition for Reorganization, even shortly before or after a foreclosure proceeding has commenced," *id.*, nevertheless, the record demonstrates that the instant filing falls much closer to the "patently abusive" than the "clearly acceptable" part of the filing spectrum envisioned by the Third Circuit in *In re SGL Carbon*, 200 F.3d at 162. Illustrative of this conclusion is the fact that this case is distinguishable from virtually every other single asset case cited by Primestone. In *In re Bergeron*, 218 B.R. 1003, 1006 (Bankr.E.D.La.1998), for example, there were multiple secured creditors whose liens only "arguably" encumbered the sole asset. In *In re Tiffany Square Associates, Ltd.*, 104 B.R. at 440, the single asset was a 272–unit garden apartment complex with four mortgages against it. The court in *In re PPI Enterprises (U.S.), Inc.*, 228 B.R. 339, 346–47 (Bankr.D.Del.1998), concluded that cases involving "a two-party dispute between a debtor with a single asset and a secured creditor holding a security interest in that asset ... are distinguished from the relationship" between PPI and its

unsecured creditor claiming lease termination damages under 11 U.S.C. § 502(b)(6).

14. The fact that Primestone could successfully reorganize (a fact assumed by this court and the bankruptcy court), therefore, begs the question of whether it is entitled to employ the "considerable powers" of Chapter 11—"the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.—[to] impose significant hardship" on virtually its only creditor. *In re SGL Carbon*, 200 F.3d at 165. The bankruptcy court found that Primestone was adequately protected by its bargained for contractual rights under state law and that it would be inappropriate to arm Primestone with the powers of Chapter 11 to disadvantage its sole secured creditor, Vornado. The bankruptcy court did not abuse its discretion in so concluding.[1]

---

1. Primestone complains that it was not given the opportunity to pursue discovery or present evidence in the bankruptcy court proceedings. Keeping in mind that the focus of the good faith inquiry is on the petitioner, the court finds that the only relevant topics for discovery, e.g., Primestone's subjective intent, related to information under the control of Primestone. Discovery, therefore, was not required. Moreover, having reviewed the record, it is not clear to the court that Primestone actively pursued its alleged need for discovery or evidence, or that the bankruptcy court actually denied Primestone the right to pursue either.