## In re MIRANT CORPORATION, et al., Debtors.

**Mirant Mid–Atlantic, LLC, Mirant Corporation, Mirant MD Ash Management, LLC, Mirant Peaker LLC, Mirant Potomac River LLC, and Mirant Chalk Point LLC, Plaintiffs**

**v.**

**Morgantown OL1 LLC; Morgantown OL2 LLC; Morgantown OL3 LLC; Morgantown OL4 LLC; Morgantown OL5 LLC; Morgantown OL6 LLC; Morgantown OL7 LLC; Dickerson OL1 LLC; Dickerson OL2 LLC; Dickerson OL3 LLC; Dickerson OL4 LLC; Sema OP1 LLC; Sema OP2 LLC; Sema OP3 LLC; Sema OP4 LLC; Sema OP5 LLC; Sema OP6 LLC; Sema OP7 LLC; Sema OP8 LLC; Sema OP9 LLC; Steamed Crab Partners, L.P.; Steam Heat LLC; First Chicago Leasing Corporation; Bankers Commercial Corporation; U.S. Bank, National Association in its capacities as Lease Indenture Trustee and Pass Through Trustee; and Wilmington Trust Company, in its capacity as Owner Manager. Defendants.**

**Bankruptcy No. 03–46590–DML–11.**
**Adversary No. 04–4283–DML.**

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

April 7, 2005.

Thomas E. Lauria, J. Christopher Shore, Maria K. Pum, White & Case LLP, Miami, FL, Robin Phelan, Ian T. Peck, Haynes and Boone, LLP, Dallas, TX, for the Debtors.

Ronald J. Silverman, Sabin Willett, Andrew J. Gallo, Jeffrey T. Kirshner, Bingham McCutchen LLP, New York, NY, Phillip L. Lamberson, Winstead Sechrest & Minick P.C., Dallas, TX, Ira H. Goldman, Robert M. Borden, Shipman & Goodwin LLP, Hartford, CT, for the Lease Indenture Trustee and Pass Through Trustee.

J. Todd Shields, Michael W. Anglin, Louis R. Strubeck, Jr., Richard S. Krum-

holz, Mark A. Platt, Kristian W. Gluck, Fulbright & Jaworski L.L.P., Dallas, TX, for the Lessor Defendants.

Paul N. Silverstein, Andrews Kurth LLP, New York, NY, Jason S. Brookner, Monica S. Blacker, Andrews Kurth LLP, Dallas, TX, Fredric Sosnick, Scott C. Shelley, Shearman & Sterling LLP, New York, NY, for the Official Committee of Unsecured Creditors of Mirant Corporation.

Gregory M. Petrick, Cadwalader, Wickersham & Taft LLP, New York, NY, for the Official Committee of Unsecured Creditors of Mirant Americas Generation, LLC.

## MEMORANDUM OPINION AND ORDER

DENNIS MICHAEL LYNN, Bankruptcy Judge.

Before the court is the Lessor Defendants' (the "Landlords") Motion for Partial Summary Judgment on Plaintiffs' Recharacterization Claim (the "Motion"), Lessor Defendants' Memorandum in support of the Motion, the Joinder of Trustee (together with the Landlords, the "Defendants") in Motion of Lessor Defendants for Partial Summary Judgment on Plaintiffs' Recharacterization Claim (the "Joinder"), the Response of Plaintiffs to Motion of Lessor Defendants for Partial Summary Judgment on Recharacterization Claim and Request that Summary Judgment be Entered in Favor of Plaintiffs (the "Response"), Plaintiffs' Brief in support of the Response, the Mirant Committee's Response to (i) Lessor Defendants' Motion for Partial Summary Judgment on Plaintiffs' Recharacterization Claim and (ii) the Trustee's Joinder Thereto and the Stipulation entered into by Plaintiffs and Defendants.

The court conducted a hearing on the Motion on March 23, 2005 (the "Hearing") at which counsel for Plaintiffs, the Landlords, the Trustee, the Official Committee of Unsecured Creditors of Mirant Americas Generation, LLC (the "MAG Committee") and the Official Committee of Unsecured Creditors of Mirant Corporation participated.

This matter is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334(b) and 157(b)(2)(A) and (O). This Memorandum Opinion and Order constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052.

### I. Background

In 2000, Mirant Corporation ("Mirant")[1] purchased certain power generation assets from Potomac Electric Power Company ("Pepco") pursuant to the Asset Purchase and Sale Agreement (the "APSA"). Among the assets acquired by Mirant were power plants located in Maryland known as the Dickerson and Morgantown Stations (together the "Stations"). Shortly after execution of the APSA, Mirant Mid–Atlantic, LLC ("Mirma") was formed to act as a holding company for the generating facilities and other assets acquired from Pepco.

In order to finance a portion of the $2,650,000,000.00 purchase price[2] under the APSA, Mirant caused Mirma to enter into a complex series of transactions whereby Mirma purported to sell and lease the assets and realty associated with the Dickerson and Morgantown Stations to

---

1. Mirant and other of its affiliates were spun off by The Southern Company ("TCS") in late 2000 and early 2001. At that time the spun-off entities changed their names. The court will use the various Debtors' current names hereafter rather than, when applicable, the corporate names is use before TSC's divestiture.

2. The purchase price additionally included obligations assumed that raised the cost to Mirant above $3 billion.

the Landlords.[3] The Landlords then "leased" the Stations back to Mirma. The Landlords directly provided approximately $300,000,000 of the purchase price under the APSA and borrowed an additional $1,200,000,000.00 from investors through the Trustee.[4] The key agreements utilized in these transactions (for each of the Stations) included a Facility Lease Agreement (the "Facility Agreements"),[5] a Facility Site Lease and Easement Agreement (the "Site Agreements"),[6] a Facility Site Sublease Agreement (the "Sublease Agreements"),[7] a Participation Agreement[8] and a Pass Through Trust Agreement (the "Pass Through Agreements").[9] Mirma, its affiliates and Defendants have since performed as required by the Agreements.

Beginning on the evening of July 14, 2003 and continuing into the following morning, Mirant and 74 of its affiliates,[10] including Mirma, filed chapter 11 petitions in this court. The cases of all 75 Debtors [11] were consolidated for administrative purposes by order entered on July 17, 2003. *See* FED. R. BANKR. P. 1015(b). Debtors have, on more than one occasion, requested from the court additional time pursuant to section 365(d)(4) of the Bankruptcy Code [12] (the "Code") within which to assume leases of real property. On the occasion of Debtors' second motion to extend time for assumption, Debtors advised the court on March 3, 2004 that they might seek to recharacterize the purported leases created by the Dickerson and Morgantown Agreements as disguised mortgages. The court then directed, as a condition to the grant of additional time pursuant to section 365(d)(4), that Debtors commence any suit to cause such recharacterization

---

3. The Landlords are 11 special purpose entities owned indirectly by Verizon Capital Corp., Bank One, N.A. and Union Bank of California.

4. State Street Bank and Trust of Connecticut, N.A. ("State Street") initially served as Trustee. U.S. Bank National Association then acquired State Street and became Trustee. The notes held by the investors were actually issued by Mirma, but payments on the notes were made from rental paid to the Landlords.

5. Each of the 11 Facility Agreements is between one of the Landlords and Mirma. By the Facility Agreements each Landlord "leased" to Mirma its undivided interest in certain of the above ground improvements at the Dickerson or Morgantown Station.

6. Each of the 11 Site Agreements is between one of the Landlords and Mirma. By the Site Agreements Mirma "leased" to the Landlords its interest in the realty at the Dickerson or Morgantown Station.

7. Each of the 11 Sublease Agreements is between one of the Landlords and Mirma. By the Sublease Agreements each Landlord "subleased" back to Mirma the realty at the Dickerson or Morgantown Station.

8. Each of the 11 Participation Agreements was between one of the Landlords, Mirma, Wilmington Trust Company serving as "owner manager", an investor and the Trustee. The Participation Agreements establish the relationship among the Landlords, Mirma and the investors lending the bulk of the funds used in the transactions. The Trustee acts in these chapter 11 cases for the interests of the investors.

9. The discrete agreements pertaining to the Dickerson or Morgantown Station are sometimes hereinafter referred to collectively as the "Dickerson Agreements" or "Morgantown Agreements" and the Dickerson and Morgantown Agreements are sometimes hereinafter referred to collectively as the "Agreements."

10. Since then additional affiliates not affected by this proceeding have filed chapter 11 petitions.

11. Actions in these chapter 11 cases are typically taken by "Debtors" due to administrative consolidation. Use by the court of the term "Debtors" is not intended to suggest substantive identity of any of Plaintiffs and other Debtors.

12. 11 U.S.C. §§ 101–1330.

by September 1, 2004. *See* Order Extending the Period to Assume or Reject Mirma Leases Pursuant to 11 U.S.C. § 365(d)(4) entered on July 30, 2004.

On August 31, 2004, Plaintiffs[13] (all of which are chapter 11 debtors) filed their Complaint for Declaratory Judgments Relating to Mirma Agreements and for Related Relief (the "Complaint" and the "Adversary") seeking, *inter alia,* a declaration by the court that the transactions embodied by the Agreements should be recharacterized as debtor-creditor rather than lessee-lessor relationships (the "Recharacterization Claim"). On October 25, 2004, Defendants filed motions seeking partial dismissal of the Adversary[14] and the court granted in part and denied in part the same. *See* Order Upon Motions of Indenture Trustee and Lessor Defendants Seeking Dismissal of Adversary Proceeding No. 04–4283–DML (the "Adversary Dismissal Order") entered on March 1, 2005. The Adversary Dismissal Order required Plaintiffs to amend the Complaint by February 11, 2005 to conform to the court's ruling on the motions to dismiss, and on February 9, 2005, Plaintiffs filed their Amended Complaint for Declaratory Judgments Relating to Mirma Agreements and for Related Relief (the "Amended Complaint"). Defendants answered the Amended Complaint on February 22, 2005, and the Landlords filed the Motion on February 25, 2005, pursuant to which the Landlords (and, by the Joinder, the Trustee) request this court to render partial summary judgment in their favor and declare that the Dickerson and Morgantown Agreements constitute true lease transactions.

## II. Issue and Standard of Proof

The Motion presents the court with the opportunity to establish the character of the relationship created by the Agreements. The standard for the court's decision in granting or denying the Motion is that for summary judgment.

As discussed below, however, the court first addresses the question of whether it should reach the merits of this Adversary. Not only is the Adversary a request for declaratory relief; it is also an invocation by Debtors of the court's equitable powers. Thus, in deciding whether to reach the merits of the Complaint, and so the Motion, the court must consider whether a declaration of rights is now necessary and will advance the reorganization process. If granting the Motion or, alternatively, entering judgment in favor of Plaintiffs serves only to alter the negotiating leverage of the parties or is inconsistent with the provisions or philosophy of the Code, declaratory relief is inappropriate.

Because the court concludes there is no need to decide the nature of the relationship created by the Agreements and because recharacterizing that relationship in this context would be contrary to the thrust of the Code, the court has determined to dismiss the Recharacterization Claim. As the court does not reach the merits, it need not address the standard for summary judgment.

## III. Discussion

A. The Dickerson and Morgantown Agreements Constitute Single Transactions

■ As a preliminary matter, the court believes it necessary to address the ques-

---

13. The Complaint originally included, apparently by mistake, Mirant Mid–Atlantic Services, LLC as a Plaintiff instead of Mirma. Mirma was subsequently included in the Adversary.

14. Defendants also moved to dismiss Mirma's chapter 11 case. The court denied that motion by a Memorandum Opinion and Order dated January 26, 2005. *See* Memorandum Opinion and Order entered in case number 03–46590–DML–11 as docket number 8060.

tion of whether each of the various Agreements must be viewed in isolation as individual, stand-alone transactions. The court views this question as comparable to an issue recently decided by the District Court in connection with Debtors' Motion for Order Authorizing the Debtors to Reject the Back–to–Back Agreement Dated December 19, 2000, and Amendments Thereto, with Potomac Electric Power Company as Executory Contracts (the "Rejection Motion") on remand from the Court of Appeals for the 5th Circuit.

In the Rejection Motion, Debtors sought to reject the Back–to–Back Agreement with Pepco, which was entered into in connection with the APSA. Debtors argued that the Back–to–Back Agreement was an agreement separate and distinct from the APSA and could thus be rejected independent of the APSA. The District Court, applying the law of the District of Columbia, found rejection of the Back–to–Back Agreement separate and apart from rejection of the APSA impermissible because the Back–to–Back Agreement was so intertwined with the rest of the APSA that the Back–to–Back Agreement could not be viewed as an independent agreement, but was rather a part of the APSA itself. *See* Memorandum Opinion and Order entered December 9, 2004 in case no. 4–03–CV–1242–A. The District Court's ruling is consistent with those of other courts that have determined that multiple agreements may constitute a single transaction for

purposes of application of certain provisions of the Code. *See In re Karfakis,* 162 B.R. 719, 725 (Bankr.E.D.Pa.1993)("The court is persuaded … that the parties intended the two separate contracts … to constitute a single, contractual agreement."); *In re Plum Run Serv. Corp.,* 159 B.R. 496, 499 (Bankr.S.D.Ohio 1993) ("[I]t is the determination of this Court that the parties intended to consider the BOS Contract as a single, interdependent contract, not as eleven divisible contracts."); *In re Ritchey,* 84 B.R. 474, 478 (Bankr.N.D.Ohio 1988) ("[I]t appears to this Court that the parties intended the sale of the business to be a single transaction. The entire business was offered as a whole, and not as separate individual transactions for land, inventory, equipment, and good will.").

In the instant case, the various Dickerson and Morgantown Agreements function together for the central purpose of establishing the ownership, possessory and operation rights attendant to the Dickerson and Morgantown Stations.[15] Just as the District Court viewed the Back–to–Back Agreement as an integral part of the larger transaction encompassed by the APSA, the court views the many individual Dickerson and Morgantown Agreements as intertwined portions of two transactions.[16] Therefore, at least for purposes of the Motion, the court will consider (a) the Dickerson Agreements and (b) the Morgantown Agreements each to establish a

**15.** Indeed, Plaintiffs' pleadings describe the individual agreements making up many of the classes of agreements (e.g. the Facility Agreements, Site Agreements and Participations Agreements) as being, for all material purposes, identical to each other.

**16.** The parties have indicated that either Maryland or New York law governs the Agreements. Though the District Court's ruling concerning the Back–to–Back Agreement applied the law of the District of Columbia, the court does not believe, nor has it been provid-

ed with or found any indication, that a different result would obtain under the law of either Maryland or New York. The court has found support for this construction at least in New York. *See Albany Ins. Co. v. Banco Mexicano, S.A.,* No. 96 Civ. 9473(DAB), 1998 WL 730337, *1–2, 1998 U.S. Dist. LEXIS 16292, *5–6 (S.D.N.Y.1998) ("Under New York law, several documents form one integrated agreement when they are executed contemporaneously as part of the same transaction.").

single relationship between Plaintiffs and Defendants.

## B. Summary Judgment versus Dismissal

■ The Motion asks that the court grant Defendants summary judgment on Plaintiffs' claim for declaratory relief that the Agreements between Plaintiffs and Defendants constitute secured transactions rather than leases. The court, however, concludes that the Recharacterization Claim should be dismissed, rather than adjudicated under Rule 56.[17] The court may apply dismissal standards in this case for several reasons.

First, in the Joinder, the Trustee asserts that a grant of relief on the Recharacterization Claim would be inequitable (Joinder ¶¶ 32—34). In so arguing the Trustee does not challenge Plaintiffs' construction of the Agreements. Instead, the Trustee takes the position that Plaintiffs ought not to be permitted to make the Recharacterization Claim at all. The Joinder is thus better construed, and is considered by the court, as a motion to dismiss the recharacterization claim.

■ Second, recharacterization of the Agreements would require exercise by the court of its equitable powers. *Vanguard Airlines, Inc. v. Int'l Aero Components, Inc. (In re Vanguard Airlines, Inc.)*, 298 B.R. 626, 637 (Bankr.W.D.Mo.2003) ("There is no prohibition in the statute preventing the court from exercising its equitable power to recharacterize a creditor's interest as something other than [sic] a secured party, lessor, or conditional vendor"); *Chicoine v. OMNE Partners II (In re OMNE Partners II )*, 67 B.R. 793, 795 (Bankr.D.N.H.1986) (as a court of equity, bankruptcy court may determine the true nature of a transaction); *see also Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 748 (6th Cir. 2001) (bankruptcy court's ability to recharacterize a claim of debt as equity stems from its equitable powers under section 105). Yet bankruptcy courts have been repeatedly instructed to use their equitable powers sparingly. *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2d Cir.1988) (bankruptcy court's equitable power to substantively consolidate estates should be used sparingly); *Dep't of the Treasury for the Commonwealth of P.R. v. Pagan*, 279 B.R. 43, 46 (D.P.R.2002) (section 105 should be used sparingly); *see also Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 523 (5th Cir.2004) (equitable powers under section 105 are not unlimited and do not allow bankruptcy court to act as a roving commission to do equity); *Barbieri v. RAJ Acquisition Corp. (In re Barbieri )*, 199 F.3d 616, 620–21 (2d Cir.1999) ("The equitable powers emanating from § 105(a) . . . are not a license for a court to disregard the clear language and meaning of the bankruptcy statutes and rules.") (*quoting Official Comm. of Equity Sec. Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir.1987)). Typically, section 105 of the Code, through which the court obtains its equitable authority, permits exercise of that authority only in furtherance of the Code. *In re Mirant Corp.* 378 F.3d at 523 ("A court's powers under § 105(a) are not unlimited as that section only 'authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code . . . .' ") (*quoting In re Southmark Corp.*, 49 F.3d 1111, 1116 (5th Cir.1995)); *Jamo v. Katahdin Fed. Credit Union (In re Jamo )*, 283 F.3d 392,

---

17. Defendants' prior motions to dismiss did not seek any relief with respect to the Recharacterization Claim.

403 (1st Cir.2002) ("The authority bestowed [under section 105] may be invoked only if . . . the equitable remedy dispensed by the court is necessary to preserve an identifiable right conferred elsewhere in the Bankruptcy Code."); *Hassett v. Banc-Ohio Nat'l Bank (In re CIS Corp.)*, 172 B.R. 748, 757 (S.D.N.Y.1994) ("[Section 105] merely provides the court with equitable powers to further the substantive provisions of the code. . . ."). As discussed below, in the present context, recharacterization would run counter to the broad policies of the Code and would not serve to enforce any specific provision of the Code. Thus, it is not appropriate for the court to entertain at this juncture the Recharacterization Claim, which should therefore be dismissed.

■■■■ Third, a trial court has broad discretion whether to hear or dismiss a claim for declaratory relief.[18] Section 2201 of title 28, which authorizes declaratory judgment suits, is permissive, not mandatory.[19] Indeed, the Court of Appeals for the Fifth Circuit has stated:

> It is well established in this circuit that a court need not provide declaratory judgment relief on request, as this matter is left to the district court's sound discretion. . . .
>
> Although a court may not dismiss an action for declaratory relief "on the basis of whim," *Hollis v. Stawamba[Itawamba] County Loans*, 657 F.2d 746, 750 (5th Cir.1981) or without providing a written or oral explanation . . . , the court may consider a variety of factors in determining whether to decide a declaratory judgment suit. . . .

*Odeco Oil and Gas Co., Drilling Division v. Bonnette*, 4 F.3d 401, 403–4 (5th Cir. 1993) (some citations omitted). *See, similarly, Wilton v. Seven Falls Co.*, 515 U.S. 277, 282, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995); *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir.2000), *Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 368 (5th Cir.1998).

In the case at bar there is no present need to decide whether the Agreements should be recharacterized or should be subject to treatment under Code § 365. The facts before the court are unlike situations in which a debtor's retention of an asset may depend on whether or not the asset is governed by Code § 365. *See, e.g., City of San Francisco Market Corp. v. Walsh (In re Moreggia & Sons, Inc.)*, 852 F.2d 1179 (9th Cir.1988) (affirming bankruptcy court's approval of trustee's sale of a purported lease because, although purported lease was not assumed or rejected within 60 days of debtor's filing for bankruptcy, court found that the transaction was not a true lease and thus not subject to Code section 365(d)(4)).

**18.** The court recognizes that Plaintiffs have stated on the record that they intend, if successful, to actually effect recharacterization of the Agreements.

**19.** Section 2201(a) of title 28 states:

(a) In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986 [26 USCS § 7428], a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930 [19 USCS § 1516a(f)(10) ] ), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such. 28 U.S.C. § 2201 (emphasis supplied).

Moreover, there are no creditors of Mirma the extent of whose satisfaction will depend upon recharacterization of the Agreements. Mirma is quite solvent and can easily perform its agreements with the Landlords while paying other outstanding claims. This is thus not the situation faced in *Duke Energy Royal, LLC v. Pillowtex Corp. (In re Pillowtex, Inc.)*, 349 F.3d 711 (3d Cir.2003) and *In re PCH Assocs.*, 804 F.2d 193 (2nd Cir.1986) cases in which recharacterization avoided a windfall to one constituency at the expense of other creditors of the same debtor. In the case at bar, the Agreements are enforceable by and against Plaintiffs, and there has been no suggestion that, absent recharacterization, Plaintiffs could not realize the benefits of their bargain.

On the other hand, though not presently in prospect, Mirma could, arguably, be the subject of a substantive consolidation[20] which would result in Mirma's liability to additional creditors whose treatment might turn on the character of the relationship of Plaintiffs and Defendants. The character of the relationship between Plaintiffs and Defendants may have to be addressed depending on the outcome of disputes between Debtors and Pepco. Twists and turns in Debtors' cases could lead to a potential forfeiture of the assets subject to the Agreements if the Agreements are governed by section 365. In any of theses situations, recharacterization could require the court's attention.[21] Because the future may provide concrete contexts in which the court will need to examine the recharacterization issue, as opposed to Mirma's present situation, the parties are better served by dismissal of the Recharacterization Claim than its adjudication.

C. Recharacterization Would be Inconsistent with the Code.

In the present context, not only is Mirma solvent and likely to pay its creditors according to the terms of their debt; as Debtors admit, Mirma can continue to perform its obligations to the Landlords.[22] Debtors also admit the Agreements would be fully enforceable outside of bankruptcy. The Agreements resulted from arms-length negotiations and provide fair, reasonably equivalent value to Debtors for their undertakings. Finally, Debtors argued at the Hearing that recharacterization would not adversely affect Defendants economically. In other words, any adverse consequences to Defendants from recharacterization would result in concomitant claims against Plaintiffs.

It is difficult for the court to discern in these facts a reason for altering Defendants' rights. Plaintiffs, however, urge that creditors of, *inter alia*, MAG and Mirant would benefit from recharacterization. Even if this is so, any benefit accru-

20. Debtors' plan of reorganization proposes limited consolidation but would not have an effect on Mirma's creditors without their consent.

21. The court has reviewed the Agreements and the authorities cited by the parties. The arguments on each side of the Recharacterization Claim have merit—understandably so given the obvious effort of the drafters of the Agreements to limit Defendants' risks to those of a lender while preserving the benefits for tax and other purposes of ownership. Disposition at the trial level of the Recharacteriza-

tion Claim would surely lead to appeals. As suggested by counsel for the MAG Committee during the Hearing, diversion of resources to this recharacterization dispute will not advance these chapter 11 cases.

22. To the extent any of Defendants might attempt enforcement of any provision of any of the Agreements which, by reason of any of Debtors' chapter 11 cases, could trigger forfeiture of assets or loss of rights by any of Debtors, either such provision would be ineffective or would warrant reexamination of the Recharacterization Claim.

ing to creditors of Mirma's parent entities would, effectively, be derivative of equity ownership in Mirma. But the scheme of the bankruptcy laws is not consistent with providing advantage to a debtor's equity ownership at the expense of that debtor's creditors.

Many specific provisions of the Code demonstrate the intent of its drafters that an entity's value would have to satisfy creditors before (absent creditor consent) any return to equity. The distribution scheme of chapter 7 (Code § 726) requires payment of a debtor's debts with interest before return to equity. Section 510(c) allows subordination of the claim of a creditor guilty of inequitable conduct—but only to other debt, not to equity. Recovery of property fraudulently transferred requires a showing of insolvency. Code § 548; *Wellman v. Wellman*, 933 F.2d 215, 218 (4th Cir.1991) ("[A] trustee or debtor-in-possession of a bankruptcy estate cannot maintain an avoidance action under § 548 unless the estate would be benefitted [sic] by the recovery of the transferred property.") *cert. denied*, 502 U.S. 925, 112 S.Ct. 339, 116 L.Ed.2d 279; *Dunes Hotel Assocs. v. Hyatt Corp. (In re Dunes Hotel Assocs.)*, 194 B.R. 967, 985 (Bankr.D.S.C. 1995) ("[W]here a debtor is solvent, such that any recovery is unnecessary to satisfy any creditors' claims, a debtor does not have standing to bring an avoidance action."); *see also Kennedy Inn Assocs. v. Perab Realty Corp. (In re Kennedy Inn Assocs.)*, 221 B.R. 704, 714–15 (Bankr. S.D.N.Y.1998) ("[A] debtor's power to avoid transfers pursuant to § 544(a) is not unrestricted; equitable principles may be applied to bar lien avoidance where the avoidance does not accrue to the benefit of creditors but instead creates a windfall for the debtor."). Section 1129(b)(2)(B) permits confirmation of a plan that provides return to equity over dissent of a class of creditors only if such creditors receive the

present value of their claims—i.e., the principal of their claims plus interest. Because of the implication of section 726 of the Code, through section 1129(a)(7)(A)(ii), that cramdown treatment must include, according to judicial gloss, post-petition, pre-confirmation interest. *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 654 (9th Cir.1997) (chapter 11 plan which provided for equity to retain interest in debtor violated absolute priority rule because it did not provide for payment of interest on objecting creditor's unsecured claim); *In re Dow Corning Corp.*, 270 B.R. 393, 404–05 (Bankr. E.D.Mich.2001).

Even provisions of the Code which would, on their face, allow limitation of payment of creditor claims to the benefit of a debtor's estate have been construed as limited to situations where the result is enhanced return to creditors. Thus, for example, section 502(b)(6) of the Code has been determined inapplicable where the result would be a windfall to equity rather than improved return to creditors. *See In re Danrik, Ltd.*, 92 B.R. 964 (Bankr. N.D.Ga.1988). *But see In re Farley, Inc.*, 146 B.R. 739, 748 (Bankr.N.D.Ill.1992) ("Danrik is properly criticized for failing to apply . . . the plain language of § 502(b)(6). . . ."); *In re Interco Inc.*, 137 B.R. 1003, 1007 (Bankr.E.D.Mo.1992) ("The Danrik decision has not been accepted by courts that have adopted a literal reading of Section 502(b)(6).").

In ruling on Defendants' motion to dismiss Mirma's chapter 11 case, it was not the court's intention that allowing Mirma's chapter 11 case to proceed would equate to a determination that Mirma may freely impair the claims of Defendants. The court reached its conclusion that Mirma could properly seek relief under chapter 11 because it was a member of a corporate

family experiencing financial difficulties. However, the rules regarding participation in distributions from an estate should not change when a family of debtors seeks relief under chapter 11.[23] Each entity in the group must be treated as separate for purposes of satisfying its creditors. *See In re Cash*, No. 91–60968, 1994 WL 732826, *1, 1994 Bankr.LEXIS 2059, *4 (Bankr.N.D.Ohio Dec.15, 1994) ("The assets of each estate can only be used to satisfy claims against that estate."); *In re N.S. Garrott & Sons*, 63 B.R. 189, 192 (Bankr.E.D.Ark.1986) ("Creditors of the insolvent Eastern Arkansas Printing Company have no legal right to look to the assets of the solvent N.S. Garrott & Sons for payment of their claims. The reverse is also prohibited."); *In re Scholz*, 57 B.R. 259, 262 (Bankr.N.D.Ohio 1986) ("[T]he creditors of each Bankrupt have the right to look to the assets of each individual estate for satisfaction of the obligations.").

Congress provided that relief under chapter 11 be on a corporation-by-corporation, rather than an enterprise, basis. Section 301 of the Code provides for voluntary commencement of a case, including under chapter 11, by the filing by "an entity" of a petition. Section 101(15) defines "entity" to include a "person." "Person" is defined in section 101(41) to include a "corporation." Had Congress wished to do so, it could have chosen definitions that would effectively pool the assets and liabilities of a family of corporations.[24] It did not elect such an approach.

Thus, Mirma commenced *its* case pursuant to section 302 and so created an estate of *its* assets (Code § 541(c)) for the benefit of *its* creditors. Those assets and Mirma's business must first be devoted to satisfaction of Mirma's obligations before they may be used to provide return to creditors of Mirma's affiliates.

The court of course recognizes that Mirma's solvency alone does not prevent impairment of claims against it. But impairment, provided for specifically by the Code (see Code §§ 1123(a)(2) and 1124), does

**23.** As urged by Defendants, a solvent debtor standing alone may be denied relief under chapter 11. *See NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108 (3d Cir. 2004) (remanding case of solvent debtor to bankruptcy court with instructions to dismiss case where debtor's reason for filing bankruptcy was not an inability to pay debts, but a desire to utilize section 502(b)(6) to limit claims of a landlord); *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir.1999) (remanding case to District Court with instructions to dismiss case where filing was not necessitated by debtor's financial distress, but constituted an attempt by the debtor to gain a tactical litigation advantage in an antitrust lawsuit); *In re Liberate Techs.*, 314 B.R. 206, 214 (Bankr. N.D.Cal.2004) (dismissing debtor's case where debtor, "suffering the frustration with lawsuits that many businesses share, seeks chapter 11 protection not because its existence is genuinely threatened by that litigation, but because bankruptcy offered enticing advantages in dealing with that litigation").

That a solvent debtor is granted relief under the Code as a member of a corporate family should not, under ordinary circumstances, diminish the rights of parties that dealt with that debtor. In other words, while membership in a financially distressed corporate family may offer an entity access to bankruptcy court that would otherwise be denied as sought in bad faith, it would be inequitable for that grant of relief alone to blur the boundaries between that debtor and its affiliates. Nor would it be appropriate to allow a debtor properly in bankruptcy by way of its membership in a financially distressed corporate family to utilize the Code to achieve results that it would not be allowed to achieve were it a stand-alone debtor with no affiliates whatsoever.

**24.** As the court noted in connection with Defendants' motion to dismiss Mirma's chapter 11 case, *see* Memorandum Opinion and Order entered January 26, 2005 at page 13, corporate structures are not designed with chapter 11 in mind.

not include recharacterization of a series of contracts as, instead, a de facto mortgage. Congress rather provided that contracts (and contract parties) could be affected by a debtor's chapter 11 only pursuant to Code § 365. Where, as in the case at bar, there is no accusation of wrongdoing or overreaching on the part of Defendants, where the transactions as structured effect a fair bargain among the parties, and where performance of the obligations by Debtors to Defendants as contracted by the parties is, at this juncture at least, possible without detriment to Mirma's other creditors, the court must be given good reason for restructuring the parties' relationships against Defendants' will. That has not been done. The desire of Debtors to convert the Agreements into claims that are impairable is not sufficient as a basis for this court to exercise its equitable powers to grant declaratory relief as to recharacterization.

### IV. *Conclusion*

For the foregoing reasons Plaintiffs' prayer for declaratory judgment that the agreements among Plaintiffs and Defendants are, in whole or in part, not contracts or leases but rather secured transactions is DISMISSED. As dismissal of the Recharacterization Claim moots the Motion, the Motion is DENIED.

It is so ORDERED.